**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HARRISON DIVISION**

**ROGER EARNEST** **PLAINTIFF**

**v.** **Case No. 3:25-CV-03088-DCF**

**SHELTER MUTUAL INSURANCE CO., *et al.*** **DEFENDANTS**

# ORDER

In a Report and Recommendation, the Honorable Mark E. Ford, United States Magistrate Judge, recommended that Plaintiff's motion to remand be granted and that attorney's fees and costs be awarded to Plaintiff. (Doc. 66). Defendants timely filed their Objections. (Doc. 68). Plaintiff filed a Response. (Doc. 69). Based on a de novo review of the record, Defendants' Objections are OVERRULED, and the Report and Recommendation is ADOPTED IN ITS ENTIRETY.

## I. BACKGROUND

This is a contract dispute about the termination of an alleged franchise or agency of Shelter Insurance Companies in Harrison, Arkansas in 2024. The business relationship began in 1976 when Roger Earnest signed on as an agent for Shelter Insurance Companies, namely Shelter Mutual, Shelter Life, and Shelter General (collectively hereinafter "Shelter"). (Doc. 3, Complaint, p. 3). In 1985, Earnest and Shelter executed an agent agreement that governed

Earnest's right to sell policies, service policyholders, and receive commissions as an independent contractor for Shelter. (*Id.* at 3-4). Earnest purportedly shouldered nearly all the costs of operating his agency, exceeding $150,000 annually from 1985 to 2024. (*Id.* at 5). The agreement allegedly prohibited Earnest from selling or servicing insurance for any company other than Shelter and, after termination, from working as an insurance agent at all in the Harrison area. (*Id.* at 4).

The events giving rise to this dispute began when the parties learned that Earnest would be the sole Shelter agent in Harrison following the retirement of the only other agent on December 31, 2017. (*Id.* at 13). According to Earnest, Shelter preferred to staff agencies with less costly agents operating under New Contracts, i.e., those executed post-1997. (*Id.* at 13-14). Shelter purportedly instructed Earnest to service the vacant agency's policyholders without transferring their policies to his agency. (*Id.* at 15). Despite reservations about this arrangement given his independent contractor status, Earnest complied with Shelter's instruction and allegedly provided free insurance services to policyholders from the vacant agency for approximately eight months. (*Id.* at 15-16).

The dispute came to a head when Earnest learned that Shelter's Regional Sales Manager Bobby Dingus and District Sales Manager Scott Rupert were

allegedly discouraging policyholders from transferring to Earnest and referring them and prospective insureds to Matt McKinney's agency in Green Forest, Arkansas, mischaracterizing it as the nearest Shelter agency to the vacant one in Harrison. (*Id.* at 16-17). Earnest filed a complaint against Dingus and Rupert with Shelter's Vice President of Audit. (*Id.* at 18). As a result, Dingus reprimanded Earnest but ultimately permitted some policy transfers. (*Id.*). He allegedly did not allow signed transfer requests from policyholders who verbally agreed with Rupert not to transfer to Earnest. (*Id.*).

When Shelter hired Joan Bell under a New Contract to staff the vacant agency in August 2018, Earnest attempted to distinguish his agency through customized advertising. (*Id.* at 19). The agreement between Earnest and Shelter did not contemplate advertising rules, but Shelter allegedly informed Earnest that he must receive approval for any customized advertising. (*Id.*). Fearing reprimand from Dingus, Earnest hesitated to complain about the restrictions. (*Id.*).

Earnest met with Shelter's then-CEO and its General Counsel in May 2020. (*Id.* at 20). According to Earnest, the then-CEO was dissatisfied with how Earnest had been treated and encouraged Earnest's son and agency manager R.G. Earnest to take over the agency under a New Contract. (*Id.* 20). Earnest told the then-CEO that Shelter assured him and other agents in the past that their

children could continue their agencies under their existing contracts. (*Id.*). A few weeks after the meeting, Earnest told Shelter's General Counsel that Earnest would continue his agency under his original agreement. (*Id.*). R.G. Earnest would continue as agency manager rather than enter a New Contract and terminate his father's agreement with Shelter. (*Id.*).

Two years later, Earnest again sought to use customized advertising to distinguish himself from Bell on grounds attractive in the Harrison market. (*Id.* at 21). Shelter allegedly resisted most of his requests. (*Id.*). Earnest informed Shelter's General Counsel that impeding his ability to optimize performance to compete with Bell and controlling his operations jeopardized his independent contractor status. (*Id.* at 21). General Counsel allegedly acknowledged that Earnest's independent contractor status somewhat limited Shelter's ability to control his own advertising, but those limits were not defined. (*Id.*). Worried about retaliation, Earnest dropped the matter until Shelter later accused him of illegal advertising. (*Id.*). General Counsel investigated the accusations and found that Earnest had not broken any advertising laws or rules. (*Id.*).

In December 2022, McKinney advertised his Green Forest agency on a large billboard a few hundred feet outside Harrison. (*Id.* at 22). When Earnest reported the billboard to Shelter, Rupert denied knowledge of the billboard but allegedly conceded that such a billboard would be outside of McKinney's

territory. (*Id.*). Rupert purportedly told Earnest that he would discuss "agent professionalism" with McKinney, but the billboard was not removed. (*Id.*).

In 2023, the professional relationship between Earnest and Bell appeared to deteriorate. (*Id.*). When Bell began accepting policy transfers from Earnest's agency and signaled that she would aggressively continue to do so, Earnest contacted those policyholders he shared with Bell and asked them which agent they preferred to manage their policies. (*Id.*). With approximately half of those policyholders choosing him, Earnest submitted their transfer requests and notified Bell. (*Id.*). Bell questioned each policyholder about the transfer and informed Rupert of Earnest's conduct, describing it as unethical. (*Id.*). Rupert agreed that the two agents should not share insureds but told Earnest that he should not accept transfers from Bell without giving her a chance to convince the policyholder not to transfer. (*Id.* at 23). He also told Earnest not to solicit transfers out of Bell's agency. (*Id.*).

Earnest pushed back on Rupert's restrictions, explaining that they were inconsistent with Shelter's published rules and imposed too much control over independent contractor agency operations. (*Id.*). Rupert allegedly countered that the rules Earnest relied upon were Dingus' personal rules for managing his region. (*Id.*). As to concerns about independent contractor status, Rupert reportedly told Earnest to speak with the legal department, which he did in

September 2023. (*Id.*).

In his report to General Counsel, Earnest outlined his concerns regarding Dingus and Rupert, their insistence on controlling aspects of his operations, their impediment of his ability to compete with Bell, and their jeopardization of his status as an independent contractor. (*Id.*). Earnest did not receive a response from General Counsel. (*Id.*).

Two weeks later, Dingus and Rupert informed Earnest that they would be in his office at 10:30 AM on September 19, 2023, but did not provide the purpose of the meeting. (*Id.* at 24). At the appointed time, Dingus and Rupert entered Earnest's agency and handed the agency manager a termination letter for Earnest, who was on vacation at the time. (*Id.*). A week later, policyholders began receiving letters that McKinney was their new Shelter agent in Harrison. (*Id.* at 27).

## II. PROCEDURAL HISTORY

This case comes before the undersigned by way of state court proceedings, a notice of removal, a motion to remand, reassignment, and consideration by a Magistrate Judge.

<u>State Proceedings</u>

Plaintiff Roger Earnest initiated this action against Defendants Shelter Mutual Insurance Company, Shelter Life Insurance Company, Shelter General

Insurance Company, Bobby Dingus, and Matt McKinney in the Circuit Court of Boone County, Arkansas on January 9, 2024. (Doc. 2-1, Complaint). Plaintiff is a resident and citizen of Arkansas. (Doc. 3, Complaint, p. 2). Shelter Mutual Insurance Company, Shelter Life Insurance Company, and Shelter General Insurance Company (collectively hereinafter "Shelter") are Missouri corporations. (*Id.* at 2-3). Bobby Dingus and Matt McKinney (collectively hereinafter "Arkansas Defendants") are residents and citizens of Arkansas. (*Id.* at 3). The Complaint alleges violations of The Arkansas Franchise Practices Act (AFPA) by Shelter and tortious interference with a contract and civil conspiracy by the Arkansas Defendants. (Doc. 3, pp. 28-32).

In his Complaint, Plaintiff stated "Shelter terminated [his] agency . . . [t]hat termination violated the Arkansas Franchise Practices Act and the Individual Defendants' conduct was tortious. For these wrongs, Mr. Earnest is entitled to damages." (Doc. 2-1, p. 2). He alleged that "Shelter's myriad violations of the AFPA" entitled him to damages "[u]nder Ark. Code. Ann. § 4-72-208" and that "[h]e has suffered damages because of Defendant McKinney's tortious interference in an amount to be determined at trial." (Doc. 2-1, p. 31). He alleged that the Arkansas Defendants "caused damages to [him] in an amount to be determined at trial." (Doc. 2-1, p. 32). Plaintiff prayed for "actual, compensatory, and punitive damages, and any other relief to which he may be

entitled." (Doc. 2-1, p. 32).

As to Shelter, the case proceeded in state court thus. A Motion to Dismiss was filed on February 16, 2024. (Doc. 2-5). First responses and objections to Plaintiff's discovery requests were provided on March 4th. (Doc. 19, pp. 11-37). The state court denied the Motion to Dismiss on July 15, 2024. (Doc. 2-17). Thereafter, Shelter Answered and supplemented its responses to Plaintiff's discovery requests. (Doc. 2-18; Doc. 19, pp. 39-73). It also served its first interrogatories and requests for production upon Plaintiff. (Doc. 20, pp. 6-22). The trial was set for February 17, 2026, (Doc. 2-19), with dispositive motions due by December 19, 2025. (Doc. 2-26). Plaintiff filed his responses on October 16, 2024 (Doc. 20, pp. 24-56), with supplemental responses on February 12 (*id.* at 62-69), May 19 (*id.* at 70-71), June 11 (*id.* at 77-112), and July 24, 2025 (*id.* at 114-119).

In early 2025, Shelter was involved in the legislative process of attempting to amend the AFPA, according to the deposition testimony of Shelter's Vice President Frank Thompson. (Doc. 36-1, pp. 2-3). During that legislative session, Plaintiff shifted his focus away from Shelter's discovery responses to focus on the legislation because it would limit lawsuits brought by insurance agents like himself. (Doc. 19, p. 2).

Plaintiff informed Shelter on August 11, 2025, that he would file a Motion

to Compel if Shelter did not respond to all discovery requests within nine days. (*Id.* at 92-94). Shelter did not comply, and Plaintiff filed his Motion to Compel on September 5th. (Doc. 2-27). Shelter filed its own Motion to Compel on September 9th, (Doc. 2-29), and Plaintiff filed a Supplemental Motion to Compel on the 22nd. (Doc. 2-30). The state court heard the motions on the 25th and took the case under advisement. (Doc. 2-73, p. 12). Plaintiff filed an Amended Second Motion to Compel on December 8, 2025. (Doc. 28).

As to the Arkansas Defendants, the case proceeded in state court in this way. They filed their Answers in early 2024. (Doc. 2-3, Matt McKinney; Doc. 2-6, Bobby Dingus). They engaged in written discovery with Plaintiff. (Doc. 46-4, Dingus; Doc. 46-3, McKinney). McKinney was deposed on November 4, 2025, (Doc. 2-38), and Dingus on November 11, 2025 (Doc. 2-35). Upon advice of counsel, Plaintiff moved for voluntary dismissal of the Arkansas Defendants on November 19, 2025. (Doc. 2-53). The state court granted Plaintiff's motion and entered an Order of Dismissal as to the Arkansas Defendants on November 21, 2025. (Doc. 2-54).

Notice of Removal

On December 12, 2025, Shelter filed a Notice of Removal in the Harrison Division of the Western District of Arkansas. (Doc. 2). The Notice indicated that the state court terminated the Arkansas Defendants from the action based on

Plaintiff's Motion for Voluntary Dismissal. (Doc. 2-54, Order of Dismissal). Shelter acknowledged that more than one year had expired since Plaintiff filed his Complaint but alleged that Plaintiff acted in bad faith to prevent removal. (Doc. 2). Shelter specified that Plaintiff improperly waited until after the removal period expired to dismiss the Arkansas Defendants and to plead the amount in controversy. (*Id.*). As such, according to Shelter, the bad-faith exception applied such that the case could proceed in federal court. (*Id.*).

Motion to Remand

On January 9, 2026, Plaintiff filed his Motion to Remand seeking return of this action to state court and requesting an award of costs and fees accrued due to the unwarranted removal. (Doc. 36). He insisted that the Arkansas Defendants were properly named parties subject to legitimate and colorable claims under Arkansas law. (*Id.*). Moreover, he vigorously litigated against them for almost two years. (*Id.*). As to the amount in controversy, Plaintiff contended that he properly claimed his damages were lost profits from Shelter's improper termination, which Shelter knew from the outset of this action in Boone County. (*Id.*). In addition, the amount of damages was not deliberately concealed to prevent removal. (*Id.*). For those reasons, according to Plaintiff, Shelter's Notice of Removal was untimely because the evidence cannot support a finding of bad faith by Plaintiff. (*Id.*).

For its response filed on January 23, 2026, Shelter pointed to the following alleged intentional acts by Plaintiff: refusing to plead the amount he was seeking; producing 14 pages of discovery responses prior to the removal deadline and 1,800 pages thereafter; providing no evidence establishing a conspiracy between the Arkansas Defendants; retaining the nondiverse defendants for more than one year; dismissing them eight days before the summary judgment deadline; providing insufficient explanation for the dismissal; and expressing preference to try this case in a Boone County Courtroom. (Doc. 46).

Reassignment

This case was reassigned to the undersigned on February 18, 2026. (Doc. 56).

Report and Recommendation

The Magistrate Judge held a motion hearing on this and other pending motions on April 3, 2026, (Doc. 65), and submitted his findings on April 17, 2026 (Doc. 66, Report and Recommendations). The Magistrate Judge found that Plaintiff's voluntary dismissal of the Arkansas Defendants and "silence as to a specific damages figure in his Complaint" were not evidence of "intentional conduct designed solely to defeat diversity jurisdiction." (Doc. 66, p. 10). It was additionally found that Shelter's "untimely attempt to remove the case nearly two years after the case was filed and two months prior to trial was

arguably frivolous." (*Id.* at 13). Based on these findings, the Magistrate Judge recommended this Court grant Plaintiff's Motion to Remand and award him costs and fees. (*Id.* at 14).

On May 1, 2026, Shelter filed Objections, disagreeing with the Magistrate Judge's recommendation to remand and to award Plaintiff his costs and fees. (Doc. 68).

As to remand, Shelter raised the following arguments: 1) a finding that the parties did not act as they should have in discovery should have weighed in favor of bad faith; 2) the record does not support the finding that Shelter likely knew the amount of Plaintiff's lost damages; 3) weight should have been given to the fact that Plaintiff kept the Arkansas Defendants in the case until the one-year limitation ran despite providing no proof to support the conspiracy claim he brought against them; 4) weight should have been given to the fact that Plaintiff gave insufficient explanation for dismissing the Arkansas Defendants; 5) that Plaintiff deposed the Arkansas Defendants should not have weighed in favor of remand; and 6) more weight should have been given to the timing of Plaintiff's dismissal of nondiverse defendants. (*Id*. at 5-14).

Further, presenting policy considerations and legislative history of the Jurisdiction and Venue Clarification Act of 2011, Shelter insisted that no presumption against removal jurisdiction applies. (*Id*. at 16 (citing *Doe v. SSM*

*Health Care Corp.*, 126 F.4th 1329, 1333 (8th Cir. 2025))). Therefore, according to Shelter, the Magistrate Judge improperly construed the allegations in the Complaint most favorably for Plaintiff. (*Id.* at 14-16).

As to costs and fees, Shelter insisted that it had an objectively reasonable basis to remove the case. (*Id.* at 16-18). It reminded the Court that jurisdictional requirements for complete diversity and amount in controversy were met at the time of Removal. (*Id.* at 17). And, acknowledging that the Notice of Removal was untimely, Shelter pointed to its own good faith in arguing the law and facts of Plaintiff's alleged bad faith in preventing removal. (*Id.* at 17-18). Shelter also argued that the lack of guidance from the Supreme Court or the Eighth Circuit with regard to the bad-faith exception should weigh in favor of declining to award Plaintiff costs and fees. (*Id.* at 18 (citing *Rawls v. Union Pac. R.R.*, No. 1:09-CV-01037, 2012 WL 371288, at *1 (W.D. Ark. Aug. 27, 2012) and *Pathfinder Transp., LLC v. Pinnacle Propane, LLC*, 259 F.Supp.3d 949, 954 (W.D. Ark. 2017))).

Plaintiff responded to Shelter's Objections on May 13, 2026. (Doc. 69). As to remand, Plaintiff reiterated the following: the Arkansas Defendants were legitimate parties; Plaintiff actively litigated against them; his decision to dismiss them was reasonable; discovery production does not evidence bad faith; and Shelter always had access to damages information. (*Id.* at 2-6). Further,

Plaintiff pointed to the Magistrate Judge's analysis that expressly weighed the evidence presented by both sides, including discovery responses, deposition testimony, affidavits, and the parties' undisputed conduct during two years of state litigation. (*Id.* at 6).

In addition, Plaintiff argued that Shelter relied on dicta to support the incorrect conclusion that presumption against removal no longer applies. (*Id.* at 6). Plaintiff agreed with the Magistrate Judge that the Eighth's Circuit's precedent applying the presumption against removal in ordinary diversity cases controlled the resolution of the case at bar. (*Id.* at 6-7 (comparing *Lefler v. Target*, 57 F.4th 600, 604 n.2 (8th Cir. 2023) ("[G]iven that this is no ordinary diversity case, we need not decide whether the anti-removal presumption survives today in other types of cases.") with *Knudson v. Sys. Painters, Inc.*, 634 F.3d 968, 975 (8th Cir. 2011) ("All doubts about federal jurisdiction should be resolved in favor of remand to state court."))). As the instant case is an ordinary diversity case, Plaintiff argued, the presumption against removal applies. (*Id.*).

As to costs and fees, Plaintiff agreed with the Magistrate Judge's finding that Shelter's decision to remove this case well beyond the one-year limitation was arguably frivolous. (*Id.* at 7-9). Plaintiff argued that Shelter's assertion that it had an objectively reasonable basis for removal based on the Eighth Circuit's silence on the bad-faith exception holds no water. (*Id.* at 7-9). The absence of

controlling Eighth-Circuit precedent, according to Plaintiff, meant only that Shelter advanced a removal theory that no binding authority supported. (*Id.* at 8). Plaintiff argued that Shelter's untimely removal disrupted an imminent jury trial, necessitated motion practice, and caused Plaintiff substantial additional expenses and irreversible harm. (*Id.* at 7-9). He also summarized Shelter's broader litigation conduct that he believed supported the conclusion to award costs and fees in this case. (*Id.* at 8).

Being fully briefed, this Report and Recommendation and the underlying Motion to Remand is ready for decision.

## III. LAW

Under 28 U.S.C. § 1441(a), removal is permitted in "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." A federal court has original jurisdiction under 28 U.S.C. § 1332(a)(1) over civil actions where there is complete diversity and the amount in controversy exceeds $75,000. *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 619 (8th Cir. 2010). Complete diversity exists "where no defendant holds citizenship in the same state where any plaintiff holds citizenship." *Id.* The removing party bears the burden of establishing jurisdiction, and federal courts must "resolve all doubts about federal jurisdiction in favor of remand." *Knudson v. Systems Painters, Inc.*, 634 F.3d 968, 975 (8th Cir. 2011); *Dahl v. R.J.*

*Reynolds Tobacco, Co.*, 478 F.3d 965, 968 (8th Cir. 2007).

Under 28 U.S.C. § 1446(c), a case may not be removed on the basis of diversity jurisdiction "more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." If the Court determines the Plaintiff deliberately failed to disclose the actual amount in controversy to prevent removal, bad faith is presumed. 28 U.S.C. § 1446(c)(3)(B).

## IV. DISCUSSION

A district court reviews de novo those portions of a magistrate judge's report to which objection is made. 28 U.S.C. § 636(b)(1); *see Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996). Here, Shelter objects to the Magistrate Judge's findings that this case should be remanded and that attorneys' fees and costs should be awarded to Plaintiff. (Doc. 68). After a de novo review of the record, the Report and Recommendation, Shelter's Objection, and Plaintiff's Response, the Court finds the Magistrate Judge's findings proper and overrules Shelter's objections.

### A. Remand

Shelter has not met its burden to show that Plaintiff engaged in intentional conduct to deny it the chance to remove this case to federal court. Courts are "mindful that the nature of federal removal jurisdiction—restricting as it does

the power of the states to resolve controversies in their own courts—requires strict construction of the legislation permitting removal." *Nichols v. Harbor Venture, Inc.*, 284 F.3d 857, 861 (8th Cir. 2002). The party invoking jurisdiction bears the burden of proof that all prerequisites to jurisdiction are satisfied. *Green v. Ameritrade, Inc.*, 279 F.3d 590, 596 (8th Cir. 2002). Thus, removal statutes are strictly construed, and any doubts about the propriety of removal are resolved in favor of state court jurisdiction and remand. *Central Iowa Power Co-op. v. Midwest Indep. Trans. Sys. Operator, Inc.*, 561 F.3d 904, 912 (8th Cir. 2009).

Here, Shelter acknowledges that it filed its Notice of Removal outside of the one-year limitation. It argues, however, that the bad-faith exception should apply because Plaintiff intentionally prevented removal by 1) dismissing nondiverse defendants after the limitation expired and 2) deliberately failing to disclose the actual amount in controversy. The Court will address each in turn.

**1. Arkansas Defendants**

The record evidence does not support a finding of bad faith with respect to the Arkansas Defendants. Because "the Eighth Circuit has not yet announced a standard for the bad-faith exception under § 1446(c)(1)," "[d]istrict courts within the Eighth Circuit have applied various standards to determine whether a plaintiff has acted in bad faith for the purposes of § 1446(c)(1)." *H&B Ventures, LLC v. State Auto Property and Casualty Ins. Co.*, 686 F.Supp.3d 846, 849 (E.D.

Mo. 2023).

Examples of factors considered by courts include: 1) when the plaintiff named the defendant in the case; 2) the plaintiff's basis for bringing the relevant claims; 3) the timing of the nondiverse defendant's dismissal; 4) whether the plaintiff actively pursued the claim against the defendant; 5) the plaintiff's knowledge that the claim against the nondiverse defendant was not supported by evidence; 6) whether the plaintiff received consideration for dismissing the defendant; and 7) whether there was a viable and consistent explanation for dismissing the defendant. *Leeds v. Norfolk Southern Railway Co.*, No. 25-00020-CV-W-LMC, 2025 WL 83372, at *2 (W.D. Mo. Jan. 13, 2025) (citing *Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 292-93 (5th Cir. 2019)).

Courts in this district limit the bad-faith exception to circumstances in which "the plaintiff engaged in intentional conduct to deny the defendant the chance to remove the case to federal court." *RJO Investments, Inc. v. Crown Financial, LLC*, 2018 WL 6885433, *4 (W.D. Ark. May 2, 2018). Courts have also declined to find intentional conduct when the nondiverse defendants were the persons allegedly responsible for causing the dispute at issue, the plaintiff included them in the initial complaint, the complaint stood unchanged beyond the one-year removal period while the parties prepared for trial, and the plaintiff kept the nondiverse defendants in the case for some time after the one-year

deadline passed. *Bajaba, LLC v. General Steel Domestic Sales, LLC*, No. 14-CV-4057, 2014 WL 5363905, at *2 (W.D. Ark. Oct. 21, 2014).

And, where a plaintiff's conduct may be suspect, but a defendant fails to meet its burden to demonstrate that the plaintiff acted in bad faith, district courts have resolved all doubts about removal in favor of remand. *Rogers v. Southern Design and Mechanical, Inc.*, No. 1:18-CV-01020, 2018 WL 3993396 (W.D. Ark. Aug. 21, 2018); *Sloss v. Tyson Fresh Meats*, No. 4:18-CV-00286-RGE-HCA, 2018 WL 9815609 (S.D. Iowa Dec. 17, 2018).

Here, Plaintiff named the Arkansas Defendants in his Complaint, actively pursued the claims against them, and kept them in the case for almost an entire year after the removal limitation period ended. Plaintiff refers to Dingus approximately 50 times and to McKinney about 45 times throughout the factual allegations and Counts. (Doc. 2-1, Complaint). He spends 11 pages detailing what he believes was the scheme, led by Dingus and aided by McKinney, to push him out of business in Harrison. (*Id.* at 13-24).

The Complaint outlines what Plaintiff perceives as the execution of a vendetta against him by the Arkansas Defendants for resisting their attempts to "direct policyholders and prospects away from his agency and to McKinney's agency." (*Id.* at 17). Dingus was Plaintiff's Regional Sales Manager, reprimanded him on at least one occasion, and delivered his termination letter.

(*Id.* at 2, 18, 24). McKinney was the subject of Plaintiff's report to Shelter about agent professionalism when McKinney erected a billboard very close to Plaintiff's territory. (*Id.* at 22). McKinney was also the agent Shelter installed in Plaintiff's place. (*Id.* at 28). The Complaint names at least one of the Arkansas Defendants in two of its three Counts. (*Id.* at 30-31). Finally, the Complaint remained unchanged past the removal period and well into the life of the case. (Docs. 2-1 to 2-76). The Court finds that these facts weigh against a finding of bad faith.

As to active pursuit of the claims, Plaintiff engaged in discovery exchanges with the Arkansas Defendants for nearly two years. He served numerous interrogatories and production requests and engaged in several hours of deposition. (Doc. 36, p. 2). Even Plaintiff's discovery requests of Shelter include some questions about the Arkansas Defendants. (Doc. 19).

The Court notes that, during the pendency of this case in state court, the Arkansas Legislature considered an amendment to the AFPA that would affect Plaintiff's ability to bring this action. (Docs. 19, p. 2; 36-1, pp. 2-3). Given the potential impact upon Plaintiff, it is reasonable that his focus might shift toward that legislation and away from discovery. Thus, while Plaintiff may have engaged in relatively small amounts of discovery, the record does not support a finding that he did so out of an "intentional, mischievous effort" to prevent

removal. *See Hopkins v. Nationwide Agribusiness Ins. Co.*, No. 4:18-CV-00315-KOB, 2018 WL 3428610, *4 (N.D. Ala. July 16, 2018) (no assumption of prima facie evidence of bad faith when plaintiff voluntarily dismisses nondiverse defendant more than a year after filing suit). The Court finds these facts weigh against bad faith.

As to the timing of dismissal, the record belies Shelter's assertion that Plaintiff's voluntary dismissal of the Arkansas Plaintiffs weighs in favor of bad faith. Plaintiff initiated this action in January 2024, and the removal limitation period expired in January 2025. Between January and October 2025, the parties engaged in ongoing discovery disputes. (Docs. 2-20 to 2-34). Plaintiff sent Notices of Deposition to the Arkansas Defendants in October and deposed them in November. (Docs. 2-35; 2-38). Plaintiff explained that counsel advised him to voluntarily dismiss the Arkansas Defendants, presumably upon review of the results of depositions. (Doc. 37, p. 8). Thus, Plaintiff moved to dismiss the Arkansas Plaintiffs approximately 11 months after the removal period expired. (Doc. 2-53). And, notably, he did so only after completing a total of 11 collective hours of deposition and consulting his legal representation. (Doc. 36, p. 2). These facts weigh against a finding of bad faith.

The Court finds that the record cannot support the conclusion that Plaintiff acted intentionally and in bad faith to keep nondiverse defendants in this case

until the one-year limitation period expired solely to prevent removal. As such, the bad-faith exception does not apply, Shelter's Notice of Removal was untimely, and this case requires remand.

**2. Amount in Controversy**

The record evidence does not support a finding of bad faith with respect to the amount in controversy. The statute defines only one form of bad faith: "If the notice of removal is filed more than 1 year after commencement of the action and the district court finds that the plaintiff deliberately failed to disclose the actual amount in controversy to prevent removal, that finding shall be deemed bad faith under paragraph (1)." 28 U.S.C. § 1446(c)(3)(B). However, the Eighth Circuit has yet to announce its standard for finding bad faith under § 1446 and, as such, district courts have applied various standards. *H&B Ventures, LLC*, 686 F.Supp.3d at 849. With respect to the amount in controversy, districts have focused on intentional delays in litigating claims and concealing jurisdictional information. *See Kum & Go, L.C. v. Veeder-Root Co.*, No. 4:13-CV-00446, 2014 WL 11514687, at *5, n.5 (S.D. Iowa Feb. 24, 2014).

Bad faith has been found where plaintiffs amended the amount in controversy outside the limitation period without reasonable justification, *Vallecillo v. Wells Fargo Home Mort. Fin. Inc.*, No. 5:16-CV-935-DAE, 2017 WL 9935522, at *2-3 (W.D. Tex. Sept. 18, 2017); where plaintiff increased the

amount in controversy without a plausible reason three months after the limitation period expired, *Hill v. Allianz Life Ins. Co.*, 51 F.Supp.3d 1277, 1281-84 (M.D. Fla. 2014); where defendants told plaintiff they intended to remove the matter and plaintiff deliberately failed to respond to repeated requests for the amount in controversy until just two weeks after the limitation period expired, *O'Conner v. Walmart Stores East, LP*, No. 20-CV-01781-LJV-JJM, 2021 WL 681874 (W.D. NY Jan. 26, 2021); and where plaintiff sought damages in excess of $75,000 after one year elapsed despite stipulating to seek less than that in the initial complaint, *Brogan-Johnson v. Navient Solutions*, No. 5:21-CV-155, 2021 WL 4597661 (N.D. WV Oct. 6, 2021).

Contrariwise, courts have found that a plaintiff's silence as to a specific damages figure in the complaint is not definitive evidence of improperly preventing removal. *Hudson v. Allstate Ins. Co.*, No. 4:21-CV-00310-LPR, 2021 WL 3081565, *3 (E.D. Ark. July 21, 2021). Some courts require a defendant to present evidence of plaintiff's "strategic gamesmanship" to prove intent to prevent removal. *Mojica v. Walmart Stores East, LP*, No. 23-CV-214-JMA-ARL, 2023 WL 3259983 (E.D. N.Y. May 4, 2023).

While this district has yet to set out what constitutes deliberate failure to disclose the actual amount in controversy under the bad-faith exception, it has considered what evidence could support, by a preponderance, a finding that an

amount in controversy exceeds $75,000. *See Walton v. Transamerica Life Insurance Co.*, No. 1:20-CV-1049, 2022 WL 1785632, at *1-*3 (W.D. Ark. Jan. 10, 2022). In *Walton*, the plaintiff sought attorney's fees and damages for a breach of contract claim valued at $21,879 and a bad faith claim with no stated valuation but that could provide compensatory and punitive damages. 2022 WL 1785632 at *2. The court noted that such claims frequently result in judgments exceeding $75,000. *Id.* (citing *Motal v. Allstate Prop. and Cas. Ins. Co.*, No. 4:20-CV-01011, 2021 WL 2173860, at *3 (E.D. Ark. Feb. 24, 2011)). As such, the court found that a preponderance of the evidence supported a finding that the amount in controversy exceeded $75,000. *Id.*

It appears to the Court that Plaintiff's failure to give a specific damages figure during the removal limitation period was not deliberate conduct designed to prevent removal. Plaintiff's Complaint, filed in January 2024, did not state a specific damages figure but made clear that he sought actual, compensatory, and punitive damages for violations of the AFPA, tortious interference, and conspiracy. (Doc. 2-1).

When Shelter asked Plaintiff for his damages model in August 2024, (Doc. 2-64), Plaintiff responded in October 2024, stating that Shelter possessed documents showing that Plaintiff's operating costs far exceeded $150,000 annually as alleged in the Complaint. (Doc. 2-65, p. 19). Plaintiff also stated

that he "intend[ed] to seek lost profits from the wrongful termination of his franchise, attorney's fees, treble damages, and any other damages" and that he would "supplement this response." (*Id.* at 6). As discovery was ongoing, he stated that he did not yet know "each cost, expenditure, damage, loss, or harm" or "each pecuniary detail of each item of actual expense or actual damage incurred." (*Id.* at 5-6).

Shelter again asked for Plaintiff's damages model in December 2024. (Doc. 2-66). The removal limitation period expired the following month. In February 2025, Plaintiff explained that he would provide the requested federal and state tax returns when he finished gathering them. (Doc. 2-67). He was also "still gathering information and data related to his damages claim" but would "supplement his response." (*Id.*). In May 2025, Shelter again requested Plaintiff state his damages. (Doc. 2-68).

In June 2025, Plaintiff stated that he intended "to seek compensatory damages from Shelter for the lost profits Plaintiff would have reasonably earned but for Shelter's breach" of the AFPA. (Doc. 2-69, p. 3). He explained that the "amount has not yet been determined but will be provided through expert witness testimony using Plaintiff's financial and tax records." (*Id.*). He reiterated, "As this litigation is ongoing, the amount of fees and costs is not yet final and cannot be determined with certainty." (*Id.*). And he directed Shelter

to the financial and tax documents he already provided that showed his "costs of operating his agency far exceeded $150,000 annually." (*Id.*).

Shelter filed a motion to compel in September 2025 (Doc. 2-29) and requested Plaintiff's damages model again in October 2025 (Doc. 2-71). In November 2025, Plaintiff identified his damages expert and claimed damages in an amount well above $75,000. (Doc. 2-63).

On these facts, a preponderance of the evidence could support the conclusion that the amount in controversy exceeded $75,000 before Plaintiff ultimately confirmed that it did. *See generally Walton*, 2022 WL 1785632 at *2. While Plaintiff remained silent as to the specific damages figure in the Complaint, he made clear to Shelter that he sought lost profits, that he spent $150,000 annually in operations costs, and that Shelter had information on his gross commissions. *See generally Hudson*, 2021 WL 3081565 at *3.

Plaintiff had been employed by Shelter for decades and, notably, Shelter admits that it had the information about Plaintiff's gross commissions. (Doc. 68, p. 6-7). Given Plaintiff's alleged operating costs annually, it would not have been unreasonable for Shelter to estimate the amount of damages Plaintiff sought for the sole purpose of determining whether it exceeded the amount in controversy required for removal. There is no suggestion in the record that Shelter told Plaintiff it intended to remove the case and, as a result, Plaintiff

waited to provide the amount in controversy until just after the removal limitation period expired. *See generally O'Connor*, 2021 WL 681874 at *1.

While Shelter makes much of the distinction between lost net profits and lost gross profits, nothing in the case law suggests that failing to provide such precise damages amounts constitutes bad faith under § 1446(c)(3)(B). Rather, a failure to provide the amount in controversy must be intentional conduct designed to prevent removal. As removal is prevented if the amount in controversy fails to exceed $75,000, the Court considers whether Plaintiff's conduct was designed to induce Shelter to believe the amount in controversy fell below the required threshold. We cannot say that it was.

Further, there is nothing to indicate that Plaintiff stated a damages figure that would preclude removal then suddenly increased that amount without reason after the limitation period expired. *See generally Hill*, 51 F.Supp.3d at 1277; *Vallecillo*, 2017 WL 9935522 at *1. On the contrary, Plaintiff remained in contact with Shelter as the case proceeded to trial and provided the exact damages claim approximately 11 months after the limitation period expired. This timeline does not support a finding of deliberate conduct to prevent removal.

While Plaintiff certainly spent a lot of time allegedly gathering the data he needed to provide a precise damages figure to Shelter, the record does not

support a finding that he did so to prevent removal. The Complaint alleges a violation of the AFPA, tortious interference, and conspiracy and seeks actual, compensatory, and punitive damages as well as attorney's fees. The Complaint discloses that Plaintiff's operating costs were $150,000 annually, and Shelter knew what Plaintiff made in commissions. With this information, Shelter could have easily inferred that the amount in controversy Plaintiff sought exceeded $75,000. As such, the Court is not convinced that Plaintiff's failure to provide the precise damages amount until after the limitation period expired was deliberate conduct designed to prevent removal.

The Court finds that the record cannot support the conclusion that Plaintiff deliberately failed to disclose the actual amount in controversy to prevent removal. As such, the bad-faith exception does not apply, Shelter's Notice of Removal was untimely, and this case requires remand.

**B. Costs and Fees**

"An order remanding the case may require payment of just costs and any actual expenses . . . incurred as a result of the removal." 28 U.S.C. § 1447(c). The standard for awarding fees turns on the reasonableness of the removal. *Convent Corp. v. City of N. Little Rock*, 784 F.3d 479, 483 (8th Cir. 2015). "Absent unusual circumstances, courts may award attorney's fees under § 1447 only where the removing party lacked an objectively reasonable basis for

seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005); *Pathfinder Transp., LLC v. Pinnacle Propane, LLC*, 259 F.Supp.3d 949, 954 (W.D. Ark. 2017). The court does not consider the removing party's motive, but "the objective merits of removal at the time of removal, irrespective of the ultimate remand." *Convent*, 784 F.3d at 483. Costs and fees may be awarded when the removal of a case has unnecessarily delayed a litigation and expended the resources of the parties, counsel, and the court. *Bainum v. Lincoln National Life Ins. Co.*, 2018 WL 1505495, *3 (W.D. Ark. Mar. 27, 2018).

Shelter's attempt to remove this case was arguably frivolous, especially when the record does not support Shelter's contention that the bad-faith exception should apply. At the time of Shelter's removal, litigation against the Arkansas Defendants had been proceeding, albeit slowly, for nearly two years. Moreover, while Shelter did not have the precise damages figure when the Complaint was filed, the information Plaintiff provided suggested an amount in controversy well above $75,000. As such, Shelter's attempt to remove this case nearly a year after the removal limitation period expired and within two months of the commencement of trial was not objectively reasonable. The Court, therefore, awards Plaintiff his reasonable costs and attorneys' fees associated with the removal and remand of the action to be paid by Shelter as the removing

defendant.

## V. CONCLUSION

For these reasons, the Court **ADOPTS IN ITS ENTIRETY** the Report and Recommendation (Doc. 66) and **OVERRULES** Defendants' Objection (Doc. 68). Accordingly, Plaintiff's Motion to Remand and Request for Costs and Fees (Doc. 36) is **GRANTED**, and this case is immediately **REMANDED** to the Circuit Court of Boone County, Arkansas.

**IT IS SO ORDERED** this 24th day of September 2026.

/s/ David Clay Fowlkes
DAVID CLAY FOWLKES
UNITED STATES DISTRICT JUDGE